Slip Op. 19-39

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SEVERSTAL EXPORT GMBH AND PAO SEVERSTAL, <br><br>  Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>  Defendant, | Before: Leo M. Gordon, Judge <br><br> Court No. 17-00209 |

**OPINION**

[Commerce's Final Results sustained.]

Dated: March 27, 2019

    Daniel J. Cannistra, of Crowell & Moring, LLP of Washington, DC argued for Plaintiff Severstal Export GmbH and PAO Severstal.

    Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Renee A. Burbank, Senior Trial Counsel. Of counsel was Christopher P. Hyner, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

    Tessa V. Capeloto, of Wiley Rein of Washington, DC, argued for Defendant-Intervenor Nucor Corp. With her on the brief was Alan H. Price, Timothy C. Brightbill, and Maureen E. Thorson.

    Plaintiffs Severstal Export GmbH and PAO Severstal (together, "Severstal") requested that the U.S. Department of Commerce ("Commerce") conduct an administrative review of its entries of subject merchandise covered by the antidumping duty order on hot-rolled steel from the Russian Federation. In the review Commerce

assigned Severstal as total adverse facts available ("AFA") the highest petition margin from the original investigation, 184.56 percent. Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from the Russian Federation, 82 Fed. Reg. 31,559 (Dep't of Commerce July 7, 2017) (final admin. review) ("Final Results"), and accompanying Issues and Decision Memorandum ("Decision Memorandum"). Severstal challenges Commerce's assignment of the total AFA rate, arguing that Commerce wrongfully (1) denied an extension request and (2) rejected its revised databases, applied facts otherwise available, and used total AFA with an adverse inference.[1] See Rule 56.2 Mem. Supp. Mot. J. Agency R. of Pls. Severstal Export GmbH and Pao Severstal, ECF No. 24-1 ("Severstal Br."); see also Def.'s Resp. to Pls.' Rule 56.2 Mot. J. Agency R., ECF No. 29 ("Def.'s Br."); Def.-Int. Nucor Corp.'s Resp. Br., ECF No. 30; Severstal's Reply Br., ECF No. 32 ("Severstal Reply").

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[2] and 28 U.S.C. § 1581(c) (2012).

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in

---

[1] Severstal withdrew another argument about the total AFA rate at oral argument.

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2019). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2018).

      Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984) governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of

unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

Severstal first argues that Commerce mishandled its April 14 extension request. A party typically leads with its strongest argument. One would logically anticipate that Severstal would then build upon that argument, contending that Commerce arbitrarily failed to provide sufficient time for Severstal to respond to the sections B and D questionnaires, which in turn unreasonably disadvantaged Severstal for the balance of the proceeding, leading Commerce to apply facts available and an adverse inference. Severstal, however, does not make that argument. Severstal instead argues that despite being aggrieved by Commerce's handling of its April 14 extension request, it "timely, completely, and accurately provided all information requested, . . . ." Severstal Br. at 17. That argument creates an irreconcilable conflict with its first argument about its extension request, which is either irrelevant and unnecessary, or renders suspect Severstal's later claim of timeliness, completeness, and accuracy.

### A. Severstal's April 14 Extension Request

Commerce addressed in detail Severstal's argument that the partial grant of its April 14 extension request was arbitrary:

> Severstal argues that the Department acted unlawfully and contrary to its longstanding practice by initially rejecting Severstal's third extension request, and then subsequently granting an additional extension of only two days. Severstal also states that it had only two days to complete its responses to sections B and D of the Department's antidumping duty questionnaire, as it did not have time prior to the final two-day extension to

       respond to the Department's questionnaire due to the need to prepare for verification on other antidumping duty cases. We disagree. The Department's antidumping duty questionnaire was issued February 19, 2016. The questionnaire provided Severstal a deadline of March 30, 2016, to respond to sections B and D. Severstal requested two extensions, which the Department granted in part, which moved the deadline to April 18, 2016. Thus, Severstal initially received a total of 54 days to submit complete section B-D responses. After initially rejecting Severstal's April 14, 2016, third extension request for an additional 14 days, the Department ultimately granted Severstal an additional two-day extension, until April 20, 2016. Therefore, Severstal was, in total, given 56 days to respond to sections B and D of the Department's antidumping duty questionnaire. Severstal stated that it "tr[ied] to prepare and file complete section B and D questionnaires in less than two days," which suggests that Severstal did not use the prior 54 days of time to prepare these sections of the questionnaire. As Severstal itself has stated, it has been involved in other antidumping and countervailing duty proceedings before the Department. The Department notes that Severstal, an experienced respondent familiar with the Department's procedures, self-requested this administrative review on December 30, 2015, less two months prior to the initial questionnaire being issued. Thus, in self-requesting the administrative review, Severstal understood the time and resource commitment it was making with overlapping proceedings.

<u>Decision Memorandum</u> at 11–12.

       Severstal argues that Commerce's "rejection of Severstal's extension request and granting only a partial two-day extension was unsupported by substantial evidence, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law." Severstal's Br. at 8. The court does not agree. Commerce highlighted Severstal's admission that it left itself only two days to prepare a section B and D response. The questionnaire instructions state that the original deadlines apply unless extended in writing by Commerce. Severstal assumed otherwise. That assumption and accompanying laxity in preparing its questionnaire responses place Severstal in a difficult

position, further compounded by Severstal attempting to mislead the court about the facts on the record. Severstal misrepresents that the "initial due date" for the questionnaire was "April 18, 2016." Severstal Br. at 4–5.  The initial due date was March 30, 2016. Severstal ultimately had 56 days to complete the questionnaires, not 2. Rather than address that 56-day time period, Severstal argues that Commerce's handling of Severstal's extension request was contrary to long standing practice. Severstal, though, only cites two extension requests from non-market economy proceedings for a different product. Severstal does not explain how these non-market economy cases are identical factually and procedurally to its market economy proceeding thereby mandating similar treatment across the proceedings. Severstal also never comes to terms with the 56 days it had to complete sections B and D. The court therefore sustains Commerce's partial grant of Severstal's April 14 extension request.

### B.  Revised Database, Facts Available, Adverse Inference

Pursuant to 19 U.S.C. § 1677e, Commerce follows a two-step process to apply facts available with an adverse inference. First, Commerce must use facts otherwise available to fill gaps in the record if, among other things, an interested party withholds information requested by Commerce, fails to provide such information in the form and manner requested, significantly impedes the proceeding, or provides information that cannot be verified. 19 U.S.C. § 1677e(a). Second, Commerce may apply an adverse inference in selecting among the facts available if an interested party fails to cooperate to the best of its ability. 19 U.S.C. § 1677e(b). An interested party fails to cooperate to

"the best of its ability" when it "fails to put forth its maximum effort to provide Commerce with full and complete answers to all inquiries." See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." Id.

Severstal requested the administrative review, and one would anticipate that Severstal would have been prepared for the review. Commerce issued its Initial Antidumping ("AD") Questionnaire that requested that Severstal report all of its U.S. and home market sales made during the period of review in corresponding sales databases. Initial AD Questionnaire, PD[3] 8, at B-1, C-1. Severstal submitted its response to section B of the Initial AD Questionnaire on April 21, 2016. Severstal's Section B Questionnaire Response (Apr. 21, 2016) (Section B Response) PD 37, CD 28–44. In its section B response, Severstal did not include a substantial number and volume of sales in its home market sales database, Decision Memorandum at 8, despite Severstal's section B narrative response that it had reported downstream sales between its affiliate, Severstal Distribution, and unaffiliated customers. Decision Memorandum at 8; Section B Response, PD 37, CD 28, at B-6. The home market sales database accompanying the section B response did not contain the downstream sales. Decision Memorandum at 8;

---

[3] "PD" refers to a document contained in the public administrative record, which is found in ECF No. 19-2, unless otherwise noted. Likewise, "CD" refers to a document contained in the confidential administrative record, which is found in ECF No. 19-3, unless otherwise noted.

Section B Response at Exhibit B-1, CD 32. Commerce explained that it discovered the discrepancies when comparing Severstal's reported home market sales in its section B response with the reported quantity of home market sales in Severstal's quantity and value chart in its response to section A of the Initial AD Questionnaire. <u>Decision Memorandum</u> at 8, n.24; Section B Response at Exhibit B-1, CD 32; Severstal's Section A Questionnaire Response (Mar. 14, 2016) at Exhibit A-1, PD 14, CD 2.

To address the discrepancies, Commerce issued a supplemental questionnaire on August 3, 2016. Second Supplemental Questionnaire for the Section A-C Questionnaire Responses of Severstal (Aug. 3, 2016) (Second Supplemental Questionnaire) PD 61, CD 95. Specifically, Commerce requested that Severstal "[r]econcile the quantity and value of sales to affiliated parties reported in Exhibit A-1 of the [section A questionnaire response] to the home market sales database of the [section B questionnaire response]." Second Supplemental Questionnaire, PD 61, CD 95, at 7. Furthermore, Commerce informed Severstal that its home market sales database did not include individual columns for the product characteristics that make up the CONNUM[4] and instructed it to "add a column for each product characteristic" and "report each sale's respective product characteristic coded in the home market sales database of the [section B questionnaire response]." <u>Id.</u> at 8. As Commerce explained in the <u>Decision Memorandum</u>, "[i]t is standard practice for respondents to include these columns in the sales databases," and

---

[4] CONNUM refers to control numbers that identify unique product characteristics, which establish the model matching criteria for making a proper comparison between U.S. and home market sales.

Severstal did report these individual columns for the U.S. sales database, but not for the home market sales database. Decision Memorandum at 9; compare Section B Response at Exhibit B-1, CD 32, with Severstal's Section C Questionnaire Response (Apr. 18, 2016) at Exhibit C-2, CD 21. To address this deficiency, Commerce issued a supplemental questionnaire to provide Severstal an opportunity to revise its home market sales database "to report these standard columns." Decision Memorandum at 9.

Severstal responded to section B of the Second Supplemental Questionnaire on September 6, 2016. See Severstal's Section B Supplemental Questionnaire Response (Sept. 6, 2016) ("Second Supplemental Section B Response") PD 74, CD 107. Severstal provided updated exhibits to reconcile its quantity and value chart in its original section A questionnaire response and its original home market sales database and claimed that the "apparent discrepancies ha[d] been removed." Second Supplemental Section B Response at 6, Exhibit 2S-16, Exhibit 2S-17, CD 107, 114, 117 & 119. Severstal also stated that the home market sales database had been updated to include the individual columns that make up the CONNUM. Id. at 7, Exhibit 2S-17, CD 107, 117 & 119. Severstal failed to inform Commerce that it had made additional, unrequested changes by changing all CONNUMs in the home market sales databases. Decision Memorandum at 9. Severstal also made similar unrequested changes to the U.S. sales database. Id. As a result, Commerce concluded that Severstal's revised home market and U.S. sales databases contained unsolicited factual information that Commerce rejected pursuant to 19 C.F.R. § 351.302(d)(1)(ii) and (2). Id.

Severstal argues as a factual matter that the information Commerce rejected was not unsolicited, but merely corrected previously solicited and submitted information. Severstal Br. at 9–13. Problematically for Severstal, it chose a curious path to correct inaccuracies within its prior factual submissions. The record is clear that Severstal did more than was asked in Commerce's supplemental questionnaire, seeking to cram those corrections into its response, all without a detailed explanation identifying exactly what it was correcting from its prior submissions, and why the corrections were necessary. A more transparent approach would have been to file the responsive supplemental questionnaire without the unrequested corrections <u>and</u> separately file a transparent correction of its prior factual submission containing "a written explanation identifying the information which is already on the record that the factual information seeks to . . . correct, including the name of the interested party that submitted the information and the date on which the information was submitted." 19 C.F.R. § 351.301(b)(2).

Without that straightforward, transparent approach to correcting Severstal's information, Commerce reasonably addressed the opacity Severstal created. Defendant explains that Severstal "attempted to make broad, unsolicited changes to its home and U.S. sales databases in the guise of responding to Commerce's supplemental questionnaire seeking information about home market downstream sales and information on home market sales product characteristics." Def's Br. at 9. Defendant persuasively notes that when Commerce requested that Severstal, in its home market database, "add a column for each product characteristic" and "report each sale's respective product

characteristic coded in the home market sales database of the [section B questionnaire response]," Commerce intended for Severstal to conform its home market database to its U.S. database. Commerce did not request that Severstal change the product characteristics and CONNUMs. Def's Br. at 13 (citing Second Supplemental Questionnaire, PD 61, CD 95, at 8).

Severstal also challenges Commerce's application of facts available and an adverse inference. Severstal Br. at 13–20. Commerce noted its authority under § 1677e(a)(2)(B) to use facts available when an interested party fails to provide information "in the form and manner requested," Decision Memorandum at 6–7, and explained that Commerce "appropriately applied AFA, because Severstal failed to provide necessary information in the manner and form requested by the Department . . . ." Id. at 7. In its argument, Severstal omits any reference to Commerce's authority to use facts available when a party like Severstal fails to provide information in the form and manner requested. See Severstal Br. at 13–14, 15 (referencing section 1677e(a)(2) but omitting the requirement that parties submit information in the form and manner requested); see also Severstal Reply Br. at 4. This is unfortunate because it means Severstal's argument is unresponsive to Commerce's determination. Commerce reasonably explained its application of facts otherwise available and an adverse inference against Severstal. Decision Memorandum at 6–10. The court simply adds that it is difficult for Severstal to claim in good faith that it acted to the best of its ability when it acknowledged before Commerce that despite having 56 days to file its responses, Severstal "tried to

prepare and file complete section B and D questionnaires in less than two days," Id. at 12 (quoting Severstal's administrative case brief).

Severstal also argues that, pursuant to 19 U.S.C. § 1677m(d), Commerce had to first issue a supplemental questionnaire for section D (relating to costs) before resorting to facts available. Severstal Br. at 20–23. Defendant persuasively counters that Commerce identified a problem with the sales databases, not the cost databases. Commerce relied on Severstal's admission that the original sales databases were incorrect to determine that they were incomplete and unreliable. Decision Memorandum at 10. Once Commerce made that determination, it did not have to embark on a fool's errand regarding the cost databases. Id. ("Had Severstal provided accurate and reliable sales databases, . . . the section D cost database would have been compatible with the sales databases and would have allowed us to run a margin program."). Commerce therefore properly determined it was not required to further modify its section D cost database prior to applying facts otherwise available. Id. at 8.

Court No. 17-00209                                                                                                 Page 13

## Conclusion

For the foregoing reasons, the court sustains the <u>Final Results</u>. The court will enter judgment accordingly.

<u>     /s/ Leo M. Gordon     </u><br>
Judge Leo M. Gordon

Dated: March 27, 2019
      New York, New York